that you have a certain amount of time. When it turns yellow, that means you have just a couple minutes left. When it turns red, you're done. So please wrap it up. Now, if we're still asking you questions, you don't get to run away. We do get to do that. But you all don't get to add extra time. That's kind of up to us. And please give us record insights, as need be, and answer our questions. So with that, we have one case today, 23-40079, in Ray Vasquez. And we will hear from Mr. Farrell first. May it please the Court. There are essentially five matters in this case that are effectively undisputed. The first is that Richard Vasquez's original trial was all about mens rea. Literally, this case, his defense was going to live or die on whether the jury believed that he intentionally killed Miranda Lopez. The second point that's essentially undisputed is that the evidence that Miranda had a massive amount of cocaine in her system when she was admitted to the hospital was essentially the most important evidence on mens rea. And we know that for many reasons, not the least of which is the state told the jury in closing argument, this is the most important evidence. So why didn't you raise that sooner than, I guess it was January 2022? And that goes, obviously, to one of the key factors of whether or not the factual predicate was reasonably available previously. And to answer that question, it's critical to understand what the factual predicate of our claim is. The factual predicate of our claim, when we have a Brady claim and a knowing presentation of false evidence, is not necessarily that the evidence was false. It was that the prosecutor had exculpatory evidence that it was false and failed to disclose it and knew that it was false and nevertheless presented it. That factual predicate was not reasonably available to us until 19 2019, when the two critical witnesses on this recanted their testimony. So why didn't you raise it while you were still pending in the first go around in the state court? Well, we learned of it in March of 2000 or May of 2019. At that point, we had then pending a application on the junk science writ. But why didn't you seek an opportunity to amend or amend that first go around? And you knew a second go around wasn't gonna go that well, assuming argument or you lost the first time. So why didn't you seek to amend or do something to bring it up? Your Honor, in hindsight, given the court's concern of that issue, perhaps we should have. We didn't. We believed at that time we had a then pending writ to which the state of Texas had agreed that we were entitled to relief. And I think that's a critical factor in assessing the reasonableness of the steps we took. We had the junk science writ pending at that time, which was based on my own biomechanics and shortfalls and head trauma. And the state of Texas had agreed that we were entitled to relief. Now, I understand that that agreement by the state of Texas didn't necessarily bind the Court of Criminal Appeals. And obviously, ultimately, the Court of Criminal Appeals didn't follow it. But we believed that we were going to prevail on the then pending writ based on the state's agreement. And in hindsight, could we have filed a motion to amend or filed a protective writ on the cocaine evidence? I suppose we could have. But the fact is, we didn't. Didn't the trial counsel have access to the toxicology report? I mean, this goes way back. This report isn't anything new. Of course, there was access. Everybody had the toxicology report. But the factual predicate of our claim is not just that there was a negative entry under drugs of abuse and then a more specific positive entry under the GMS screening test. That was obviously known to everybody. The factual predicate of our claim is the linkage between those two things. That, in other words, that they both cannot be true. That is not evident from the face of the report. In fact, if you look at the report, there's nothing in it that tells you that the drug of abuse screen necessarily tests for cocaine and, therefore, would be inconsistent with the more specific finding. But wouldn't that have been a question somebody should have asked? Well, perhaps. But you've got to remember that our claim here is that not just that the evidence was false, but that the state knew it and that the state suppressed exculpatory evidence on it. And there was nothing in the, from the face of the report or otherwise in the trial record that would have alerted anybody to the notion that the state had evidence that they now effectively concede was exculpatory and they didn't disclose it. Are you talking about the notes of the toxicologist or whoever it was, the state's witness? Absolutely. Pre-trial notes? Absolutely. Also, are you not traveling then under the report itself as a claim? I thought, I mean, are we going to move past that and just focus on Brady and Giglio or what? Well, the prime, so as you know, we have many alternative claims, some of which, frankly, have been presented to preserve for potential further review. For example, the unknowing presentation of false evidence, which I think goes to the point you're making. And I get it under the current precedent of this Court, that's not a claim, but we've asserted it to preserve it. The primary claims that are valid claims, don't need any further adjudication from the Supreme Court, are the ineffective assistance claim, the false, knowing presentation of false evidence claim, and the Brady claim. And on those, there is nothing on the face of the report, the toxicology report, nothing in the face of the trial record to put anybody on notice that there was a problem. It just seems like to me that if the report says, no drugs found, and then it gives amounts for cocaine, I mean, wouldn't that be a question counsel would have explored? That begs the question of, does the initial negative entry of drugs of abuse, does that, is there a reason for somebody to believe that that would capture cocaine? And I submit that when you have a negative under drugs of abuse, and a specific positive for cocaine, the logical conclusion from anybody reading that, is that the drugs of abuse screen must test for something other than cocaine. Otherwise, there would be... Well, you've got the doctors who basically agree with that. I mean, they say in their recanting affidavits, we wouldn't have known. Correct. But I mean, is that enough for somebody not to have asked a question back at the time? There's more. And that is Dr. White, the Nueces County medical examiner, who put the cocaine into his death certificate, put the cocaine into his autopsy, testified at trial. He has testified now in his 2019 affidavit that he didn't appreciate the linkage, and that they both could not be true. And I would submit to the court, if a trained medical examiner who has himself commissioned, reviewed hundreds, if not thousands of toxicology reports, if he didn't appreciate the difference, it's not reasonable to suggest that lawyers should have, or certainly the client should have appreciated the difference. And I think that's a key fact in assessing whether, you know, you can say from the face of this report, everybody should have known. The doctor, the trained medical forensic pathologist, didn't know, said he didn't appreciate that until he saw Dr. Backer's later report in 2019. So again, I would submit that if a medical doctor doesn't know it, it's not reasonable to expect lawyers to know it. And remember that the lawyers here, trial counsel, did do due diligence on the cocaine. Their primary concern about the cocaine was not, was it actually in her system, but how did it get there? They knew the state was going to argue that. A little bit. You said something at the outset about the cocaine in the system being, I may misquote you, but the single most important evidence in terms of mens rea in the case. The victim died in this case of excessive blunt force trauma. Isn't that correct? Isn't that what the conviction is for? It is for, right. The indictment was for striking her in the head and causing her death. Okay. So my, as I went through the materials on this to prepare for this today, was the, I take it now from your statement that the evidence regarding the cocaine in the system was introduced as part of the guilt phase. Is that correct? Guilt and punishment, but yes, guilt. Okay. Okay. Was there an argument made either in closing arguments or at some point during the trial that the cocaine in the system caused the death of the victim or was it strictly a blunt force trauma case? No. The argument, well, let me back up. The medical examiner's report does list cocaine intoxication as a contributing cause to the death, but the indictment didn't allege that the cocaine caused the death. Okay. And is there any evidence, was there any evidence at trial that the defendant provided or forced cocaine into the system of the victim? All of the doctors testified that, Dr. Backer and Dr. White testified that they could not say how the cocaine got into her system. Nevertheless, the state argued repeatedly over and over again, that Vasquez injected her with cocaine. Because of the timing of the argument of when the cocaine came in and he was the only adult in the room, right, or in the house. That was the argument, but the timing doesn't support the inference. No, but what I'm saying is to address your point, like did it matter about the cocaine? It was because they were saying that the circumstantial evidence showed he gave the cocaine. Oh, absolutely. And the argument, so the cocaine wasn't indicted, wasn't part of the indictment, wasn't part of the argument on cause of death. But when you read the transcript, the trial transcript, it is so clear that it was the driving force of the state's argument on mens rea. They told the jury in opening statement, it's the most important evidence, not just in the case, it's the most important evidence on mens rea. They say that anybody who would kill an adult was the argument, must have had the intent to kill her. Then when we get to the closing argument, they say, this is, again, the most important evidence on mens rea. It's the straw that breaks the camel's back on mens rea, and it proves he's such a depraved monster that he must have intended to kill her. And my whole point is when you subtract that, then what you're left with, and we also have Dr. Burke's testimony on the car crash equivalency, which I'll get to in a minute, but when you take that out, what you're left with is a case that, unfortunately, I'm not justifying any of this, but are not all that uncommon. A young drug addict in the care of a four-year-old girl gets frustrated, hits her, and she ends up dying, but that doesn't in and of itself equate to did he to kill her. And without the extraneous, he's a monster stuff, I just don't think you can get there. And I think it's critically important here that that's . . . So you're trying to say there's a difference between like poisoning someone, where you know you're going to kill them, and kind of pushing someone, and then they end up falling down and dying, and you just meant to irritate them or be mean to them. Is that the kind of distinction you're making? In a sense. I mean, there are, in the case books, thousands of cases where, you know, child abuse cases or neglect cases where children end up dead because somebody overreacted and hit them. Those cases are not usually indicted or tried as murder, and certainly not . . . Okay, but your opponent says, well, if you caused the death, why are we here? Well, because that's not the standard. The standard is whether I have made a prima facie case that if you consider my new evidence and you take the bad evidence out of the case, whether a reasonable, or whether any reasonable juror would have found the defendant guilty of capital murder, which focuses on the elements of the offense of capital murder, one of which is he intended to kill her or knowingly killed her . . . So the intent is a big part of it, not just that she was under six. Oh, absolutely. I mean, obviously under six has to be there in order for some other circumstance to get it to be capital, but it also, you have to have . . . The intent. The intent or knowing, because murder in and of itself under Texas law, not capital, is either intent, knowing, and then there's a third, lesser mens rea standard . . . Recklessness. Essentially, recklessness, and here he was indicted to get it to be capital murder only on the knowing and intentional piece, and so when you take out the he's a monster stuff, then you're left with, I would submit, a case where reasonable jurors . . . And again, we're here on a first gate . . . We're well aware. If we were to grant this, then you understand it goes to the district court, and the district court can still deny it, and we can still affirm that denial. I understand completely. So this is just, as you say, a first gate, but it's an important gate. It's not a gate we unlock every day. No, I understand, and I realize that it's not a gate on which you normally have oral argument. I appreciate the opportunity to be here. Well, I'll tell you the thing that I personally thought, I'm not speaking for my colleagues, that I thought is the most unusual, I guess, is that the state agreed with you at the state level, and now the state is disagreeing with the state. So that's kind of odd that there's this argument that the district attorney is just anti-death penalty, and so that district attorney is just going to, no matter what the evidence is, go with you. But you said that that district attorney sought the death penalty against someone. Is that correct? Yes. So there's no question. I mean, attached to the newspaper articles, there's no question he's viewed as a progressive district attorney, and that's part of the argument that they make. But since he's been in office, he has indicted some cases for the death penalty. Not a lot, and he says, I do it sparingly, but at least in 2018 and 19, he was not an unwavering opponent. Well, and he wasn't just conceding that your client shouldn't get the death penalty. He was also saying a new trial. Well, that's ... Which would be different, because you can take a capital murder and make it a life without parole, or I don't remember the year that they did that, life without parole. Maybe it's life with parole. But anyway, whatever it is, you can go to prison for the rest of your life without being executed. But that didn't seem like what he was arguing for at the state level. He was arguing for a new trial on guilt, too, right? Right. So what he did in 2019 at the state level, you know, I went and met with him before the hearing. I presented our detailed findings of fact and conclusions of law, and I said, look, I'd like to convince you that these are right, that I have evidentiary support for them, and you should support our position. He reviewed it. Again, not is he entitled to the death penalty or not. He reviewed the facts, and he reviewed my detailed findings of fact, which included a finding of fact that the cocaine evidence was false, should never have been relied on. And based on his review of the fact findings, not only told the trial court, the state trial court, that he agreed we were entitled to relief, but he agreed to the entry of our findings of fact that each of them was supported by the evidence. That's not a position that says, give this guy relief because I'm unwaveringly opposed to the death penalty. Now, and look, I fully understand that once we're now here in federal court, there's at least an issue about who gets to speak for the state in this case, where the state is fighting with the state on this. Well, I think it's very rare. You know, there is the Saldana versus Roach case, but in that case, the DA essentially conceded that once you get to federal court, the Attorney General had the right to speak. And to me, the distinction is, even if you assume the Attorney General has the right once we get to federal court to be the lawyer for the state, that begs the question of, who is the client for the state? And that's a distinction that was drawn in the . . . Because district attorneys have a lot of different abilities. Well, under the Texas Constitution, and this is the Saldana versus Texas case from the . . . Saldana versus state case from the Texas Court of Criminal Appeals, unlike most states, in Texas, under the Texas Constitution, district attorneys are the only ones who have the ability to handle criminal cases. The Attorney General has no independent criminal authority, unlike in most states and unlike in the federal system. And so, Gonzalez, his office, he obviously . . . And a lot of discretion. Well, a lot of discretion. And that's ultimately my point on this, is that the person who is charged under the Constitution and elected by the citizens of Nueces County to make these kinds of assessments every day, what would a reasonable juror do with these facts? That's his job. He has looked at these facts and he has come to the conclusion that we're entitled to relief based, among other things, on the importance and the falsity of this cocaine evidence. And, you know, I'd like to come back to the point about it being on the face of the report, because I . . . look, I understand that that's an argument that I have to deal with. And negative, positive, it is right there. But you have to look at what is the . . . for 2244 purposes, you have to look at what's the factual predicate of my claim. And the factual predicate of my claim is not that there was a positive and a negative entry. The factual predicate of my claim is that the two cannot both be true. And I would submit to you that ultimately, I discovered that not because I was investigating whether there was cocaine in her system. I discovered that because I was looking at ways to possibly blunt this ingestion issue. On the issue of was there cocaine in the system, was the report valid, his trial lawyers did exercise due diligence. They went and they met with Dr. White, who wrote the autopsy findings that said cocaine intoxication was a contributing cause to the death. And at defense counsel's request, Dr. White went back to the toxicologist that came back to defense counsel and confirmed that the report was accurate. At that point, without knowing the linkage between the two, and with Dr. White himself not understanding it, I don't think it's reasonable to suggest that lawyers should have figured it out. Ultimately, the question then, and one other point on this, even if I'm wrong about all of that, and therefore my Brady claims and my Gigolo claims aren't valid, I still then have an ineffective assistance counsel claim, which under Trevino, I'd have cause for any procedural default on that. So you're saying if it's obvious, then it's an ineffective assistance counsel. If it's not, then it's Brady and Gigolo. Yes, and not on the Brady and Gigolo point, not just because the report is false, but because there is evidence that the state knew it was false. Okay, while we're talking about 2244, I mean, you need to concede that the claim presented in a second or successive habeas application under 2254 that was presented in a prior application shall be dismissed. So your claims eight and nine, I don't see how we can do anything other than shall. I agree, obviously, I can't dispute the text, and I asserted that claim to simply preserve an argument for perhaps later consideration that actual innocence remains an exception to that statutory bar. I get that that's an uphill battle, but I didn't want to, especially in this world where procedural defaults pervade, I didn't want to waive that argument. But I concede from the text of the statute that eight and nine... Well, and we do have a procedural default issue on some of the others on the statute that is independent of a constitutional argument. Well, remember, though, that Judge Minales in the state court, his findings on the cocaine piece were at a point in time when the cocaine was not a standalone claim for relief. It was part of the factual mix that we were arguing on why the car crash and the shortfall evidence was the materiality of that. And frankly, his finding, I think even if you construe that finding as being bind or potentially binding for today's purposes, I still have the ability to argue it's not a reasonable finding in light of the evidence presented. And with all due respect to Judge Minales, it is completely made up out of whole cloth. What he said was... I was talking about the fact that you brought it a second time in 2022. Oh. You're claiming manifest injustice on that, if I'm understanding. Well, I don't believe that there is a fact finding from the Court of Criminal Appeals that the cocaine issue could have been discovered and brought earlier. All we have from the Court of Criminal Appeals is a unexplained denial under Section 5. There is no explanation as to whether it was denied under 5A1, 5A2, 5A3. And I concede... You know, this Court has written a fair amount on the impact of an unexplained denial or abusive writ finding from the Texas Court of Criminal Appeals. I find that, especially in the Atkins context, that case a little confusing. But as I understand it, this Court has recognized that a 5A1 abusive writ finding by the Court of Criminal Appeals is not necessarily by itself an independent and adequate state ground, because in the 5A1 inquiry, the Court of Criminal Appeals looks not only at the timing of the issue, but they look at the prima facie, whether you've made a prima facie case of a constitutional violation. And here it's unexplained from the Court of Criminal Appeals why they found an abusive writ. Therefore, I don't think that there's a fair reading of it that would say it's an independent and adequate state ground. I would also respectfully submit, and I realize I'm nearing the end of my time, that procedural default issues, I would suggest respectfully, are not part of this Court's Gate 1 review. I think we get to procedural default issues, if at all, if I pass through Gate 1, if I pass through Gate 2 at the district court, and then we'll have the opportunity to fully develop and argue any issues of procedural default, at which point we'll have all of the cause and prejudice. But aren't you claiming manifest injustice on that? Absolutely. Okay. I just wanted to be sure. No, no. Well, not just... I asked you, and you didn't say so. No, I apologize. Not just manifest injustice, but cause and prejudice. Yeah. Okay. Yeah, I saw that. I just wondered why you didn't respond. Okay. All right. Well, your time is up, but you have reserved some time for rebuttal. Thank you very much. Thank you. All right. Ms. Vindell? Yes, ma'am. Okay. May it please the Court. Boskus obfuscates the question before the Court by presenting a shell game of who may be new what and when in whatever way suits him best. His efforts to sow confusion are meant to convince the Court that he passes through the first gateway, a gateway which, in his view, presents a threshold so low that it's basically no threshold at all. But what Boskus is required to prove is that no reasonable person could have discovered his claims prior to or during his initial federal proceedings. And he must also prove that it is reasonably likely that every single juror would have a reasonable doubt about his guilt in light of his so-called new evidence. He tries to prove both with nothing more than emotional pleas, post hoc rationalization, supposition, and quibbles. This is not enough, and the Court should deny authorization. Before turning to the statutory prongs of 2244B, I'd like to address District Attorney D.A. Gonzalez's concession in this Court and address some of Judge Haynes' concerns. The short and long of it is that D.A. Gonzalez's concession has no legal relevance in these proceedings, and that's for a couple reasons. One, to the extent what they're arguing is that there's some relevance outside of the statutory prongs, that would be asking the Court to create an equitable exception to 2244B that does not exist, and the Court does not have the authority to do that. But perhaps more importantly, D.A. Gonzalez has no authority in these proceedings. This has been definitively decided in Saldana v. Roach. The only party with authority in these proceedings is the Attorney General's office. But what about the argument that having agreed at the point where the District Attorney was the right attorney supports some of the argument, I mean, you've said this is kind of fake, they're just swirling around, so on and so forth, but when the District Attorney agrees with the defendant's attorney, that gives us a little pause, doesn't it, that maybe there is some validity to what is being said on the facts, and maybe the facts are right and so on and so forth. So I'm not saying it's an exception to 2244, but doesn't it . . . I don't recall seeing something quite like this before, so it's a little bit unusual, and isn't that something that we should at least consider? No, Your Honor, unless that concession fit within the terms of the statute, and it does not. All he conceded to in the state court, and again, it was just a vague agreement to the proposed fine as into a relief, as the state habeas court found, were two non-cognizable claims in this court. He only agreed to the 11073 claim, which is a statutory, not a constitutional, creation by the Texas Court of Criminal Appeals, and he also agreed to an unknowing use of false testimony. Both of those were only relevant to the junk science. But he . . . didn't he concede to the findings of fact? He conceded to Mr. Vasquez's proposed findings of fact, and all he said on the record was that he agrees to relief. That's precisely why this . . . But the findings of fact, then, are agreed by both sides, and isn't that something we should consider? Again, Your Honor, looking at those findings, though, the only thing he substantively agreed to were non-cognizable claims before the court. So it is unclear how, given that these are not even constitutional claims, neither 11073 nor an unknowing use of false testimony have been recognized by the Supreme Court as raising Federal constitutional issues. Even if we say that that is what he agreed to, it has no impact on the authorization decision before the court, because those claims don't even fit within the framework at all. So the only difference here, perhaps had he conceded to actual innocence, that might have been something, but Mr. Vasquez also conceded or abandoned that in the third writ. So those proposed findings did not account for actual innocence. And, in fact, he said repeatedly that he had no burden to prove that in the state courts. So if we take what was on the findings and apply that here, it still has no relevance here. And as to Your Honor's questions about D.A. Gonzalez's vocal and public opposition to the death penalty, the article that Mr. Vasquez attached to his Sir Sir reply is actually almost a full year and a half before he conceded or agreed to the findings in this case. So if he's going to argue that so much has changed since March 2019, that applies equally to his argument as well. Yeah, but I mean, I've definitely seen district attorneys that are not in favor of the death penalty, but nonetheless argue in its favor when they're having to defend it and so on and so forth. So I think that's your opponent's point is just because you have a you know, and as a judge, whatever we think about the death penalty, we think it's great or we think it's not so great. We still have to apply it properly. So I think that that was the point that was trying to be made. That's fair, Your Honor. And I think that is absolutely true. And that may have been why he sought the death penalty within the first year of his election. But in the interim, he has not just said in a case by case basis he may pursue it or he may not. He has said and he moved to withdraw an execution date that one of his own assistants had set on the basis that he believed the death penalty was unethical in all circumstances, not specific to that petitioner, but for every defendant. And the other letter that's attached to I believe it's Exhibit 2 in the director's appendix also showed that he signed on to a letter committing to abolishing the death penalty. But if he thought that Vasquez shouldn't get the death penalty but did commit an intentional murder of a little girl, then he would be seeking the punishment change, not the guilt, not a new trial of the guilt, but a new trial of the punishment or just pulling back the punishment to a life in prison, right? Because if you're opposed to the death penalty, it doesn't mean you're in favor of people That's true, Your Honor. But he may have been against the factors that made him eligible for the death penalty in the first place. Again, though, it's unclear because the junk science claims did not require a finding of innocence. They did not require anything about the actual guilt underlying the offense. He just agreed to whatever relief was sought in the State Habeas Court, which is why the State Habeas Court essentially disregarded it and having looked at the record, as this chose to enter its own 83 pages of findings of fact and conclusions of law, finding that all those assertions were incorrect. Let's talk about something else. I mean, setting aside what the DA believes or doesn't believe. So we've got this toxicology report. There's evidence in the record that a state witness knew before trial that there was this inconsistency in the report. It wasn't disclosed to the other side. So talk about the Brady violation and juxtapose that where, you know, the argument the state makes, I think, is, well, it was sort of obvious on the thing. Somebody should have asked a question. They should have been diligent. They should have found things earlier. I mean, how does the toxicology report not support either a Brady claim or an ineffective assistance claim? I mean, Vasquez sort of has you wrapped around the axe a little bit, don't they? No, Your Honor, not as far as the statute. Because the question here is could have someone discovered it? And essentially by saying that somebody is at fault here, that means they could have. It's an objective… Well, but if they could have discovered it, I mean, so could have the state also, right? I mean, doesn't that support the… I don't know. It just seems like one or the other is supported. Yes, Your Honor. But what they all point to is that some objective person could have discovered this factual predicate. Whether it was actually false is a different question. It goes to the merits of the claim, not to the diligence prong. And I'd like to step back a little bit and provide some context on the Trautman notes. The Trautman notes appear to have been an interview with a prosecutor and Donna Trautman, who was one of the toxicologists who also signed the report. In the notes, the only thing it says is it describes the two-step process, which is that first, there is a screening test that is a binary, are there drugs, yes or no? And the second is the confirmation test that defines what that drug is and what the quantity is. That's all the notes say. And if Mr. Vasquez is correct that that was enough to illustrate the inconsistency, then everyone sitting in court when Dr. Backer said the same thing is also on notice. Because Dr. Backer did, in fact, describe the tests in that exact manner. He described that the first one is a screening test and it measures reactions to various cocaine as within that screening test. So any assertion now that nobody knew cocaine was part of both tests is immediately belied by Dr. Backer's testimony at trial. Then what do you do with the doctor's affidavits in 2019 that say, well, we wouldn't have known, and especially Dr. White, I guess, said I wouldn't have ascribed this as a cause of death. Yes, Your Honor. And just very briefly for the record, Dr. Backer's testimony is at the 36th volume of the reporter's record on page 6. But as to Your Honor's question as to what do we do about the doctors who in 2019 said that, Your Honors, I would encourage you to look closely at those declarations. They are not full recantations. He is nowhere suggesting that his testimony that there was cocaine in the system is, in fact, false. And that's because Vasquez's argument that they can't both be inconsistent goes both ways. There is no proof that the screening test was not actually positive. And there's no proof that the confirmation test wasn't actually accurate. All he says is they can't coexist. There's an inconsistency which is different than falsity. Correct, Your Honor. But you still have the doctor's affidavits in 2019 saying there's this fatal inconsistency in the report and it's not reliable. Well, they say that on the face of the report. But as Your Honors, I'm sure— What evidence contradicts that? As I'm sure Your Honors are well aware, experts regularly rely on their raw data at trial. Mr. Vasquez alleges, and I'm not sure where because I don't see a citation, that the state never showed him the report itself. But it is clear that Dr. Bakker is testifying to the results. And that what's likely the answer to that is that he had the data with him on the stand. He suggests now in his declaration that if he had that data, he could tell us definitively which one was false. And so the most likely explanation is exactly what the state habeas court found. Dr. Bakker testified at trial that the screening was positive and that the confirmation was positive. And what that most likely means is that the negative result on the TOCS report was simply a typographical error. You said that testimony is in Volume 36? Yes. Dr. Bakker's testimony describing the process and specifically listing cocaine is in Volume 36. That's page 6. And what this means, as opposing counsel conceded, everybody had the report. What he gets incorrect is that everyone also knew cocaine was in both and that that was testified to at trial. By his own argument in the reply, what that means is that the report was self-evidently inconsistent. And as such, any other arguments to the contrary, especially trying to explain why three different sets of attorneys over the last 30 years didn't choose to look into what he claims was the most important part of the state's case. But when he finally did, oh, my heck, you get these affidavits. I mean, it is kind of a strange swirl around to me. Well, Your Honor, the test is not subjective discovery, and that's all he's describing. But the doctors say they wouldn't have seen it, so how can we hold the lawyers to see it? Your Honor, I would disagree with that characterization of the declaration. The doctors did not say they didn't see it. Dr. White never says that he didn't see a negative test result. The significance of the inconsistency. That's correct, Your Honor. And I think what that highlights is the objective versus subjective nature of this test. Your position is basically somebody should have looked at this piece of paper and said, something's not right about this. Why is one no and this is yes? Yes, Your Honor. I would posit that cocaine is obviously a drug of abuse. So without knowing more than was on the report, it is clear that it would have been. Yeah, but there are all kinds of tests of drugs that don't test every drug. And how are you supposed to know if you're just some regular lawyer what test does what when the doctors are the ones telling you what is happening? I mean, I like to think that I'm a pretty good lawyer and judge, but I'm not going to pretend that I can argue with my doctor when she says X, Y, Z. Well, Your Honors, if it is true that they knew this was important evidence and if it is true that the report gave no information at all, to Your Honor's points earlier, why didn't anyone ask a single question then? And moreover, they didn't need to because Dr. Backer said it at trial. Was the doctor introduced at trial? It was. It was? It was, Your Honor. In fact, it was filed and provided to defense counsel six months prior to trial. But it wasn't introduced as evidence. It was admitted as evidence. It just wasn't put before the doctors when they were testifying? That's what Mr. Vasquez claims, and he doesn't make any reference to the report in his testimony. So we're not sure if he looked at the report before, if he looked at the data before, but ultimately the question here is could someone have found it? And it's evident that if you have the report, if you listened to the testimony and you understood that these two processes have a binary versus a specific result and that they test for the same drug, the inconsistency was available at trial. And as such, he can't show that he has exercised due diligence, not that he has, but that no reasonable person could have found that. And what about the ineffective assistance claim? Doesn't that then elevate in terms of meeting the prima facie elements? It may, Your Honor, except it does not because, again, by arguing ineffective assistance, what you're implicitly conceding is that it was available at trial. You must. Otherwise, there cannot be ineffective assistance. And that means? And it's barred as successive. Yes, Your Honor. Then you plead yourself directly into the first prong of 2244B. But what about Ms. Gale's assessment? Oh, I'm sorry. The ineffective assistance of counsel is up here. But if you say ineffective assistance of counsel for A, that doesn't mean that you barred all ineffective assistance of counsel because it was for A and not for B. Well, the claim here, Your Honor, is failure to discover and investigate the inconsistency in the cocaine evidence. And if that's the claim, it means he must have been able to find it. Otherwise, there is no deficiency. Okay, but I'm just saying that I don't know that it's a 2244B1. No, I'm sorry, Your Honor, not B1. There are three different IATC claims here. Two of them have been previously adjudicated. Those have nothing to do with the cocaine-based evidence. That's what I was saying. Yes. Sorry, I interrupted you. Go ahead and finish. I just wanted to make sure we were clear on that. Yes, yes. And I'm not talking about – Not every ineffective assistance of counsel is the same. Correct. And I'm not suggesting that those two are barred for that reason. They're barred because they've been previously raised. The only IATC claim that's currently before the court for authorization purposes is the IATC for failure to discover the cocaine-based evidence, which necessarily pleads directly into a lack of diligence. And therefore, whatever the merits of the claim may be, he cannot meet 2244B2. You make alternative arguments? Because you kind of are. You're saying, oh, no one knew and everyone knew. And so he's saying, well, if no one knew, la, la, la. If everyone knew, doodly-doo. And he's just trying to cover all of that. And why isn't that appropriate? As a lawyer, you make alternative arguments just so that your client can win on one or the other. Well, Your Honor, respectfully, our argument is not that no one knew and everyone knew. It's that everyone could have. Everyone, the state and trial counsel, everybody could have. And that's the only question before B2. Let me ask you this. If it's this confusing, if we're having this much trouble interacting on this, why isn't this something to send back to the district court for a full analysis at that level, which can be a denial? I mean, if we were to grant this first gate, that doesn't mean that you get into the house yet. Okay? You're just on the property. So why isn't this a case where there's just so much back and forth and up and down that it makes some sense to let the district court have a full examination of it? Certainly, Your Honor, in certain circumstances that could be true. The director does not believe that the diligence question on the toxicology report is confusing because no matter what way we look at it, whether it's the state, whether it's trial counsel, and especially if it's trial counsel, that means someone could have discovered it. And this is intended to be an actual screening. It's not intended just to have questions or quibbles with the record and especially where it's not likely he will ultimately meet it. There is a standard to meet here, and it's that he's reasonably likely to satisfy the statute. Congress imbued this court with that screening mechanism, and, in fact, when it did so, it took it away from the district courts. So it's intended to be a hurdle. No, I understand that. But it is still a preliminary and tentative ruling. It is not. If we were to send this to the district court, I'm not saying we will, but if we were, it does not mean that we might not down the road affirm a denial or reverse a grant. Okay? You understand that? Yes, Your Honor. And that's clearly part of the rule. Yes, Your Honor. Okay. Now let me ask you this. In initial habeas cases where it's a death penalty and we're trying to decide whether to grant a certificate, we are told by our precedent that if this is a death penalty, you know, any doubt should go to go ahead and grant the COA, the certificate of appealability. Should we apply that kind of standard here? I realize this is a different context. This is successive petition application. But is that same concept here that it's a little different when it's a death penalty? No, Your Honor. And I think that distinction about first and second is an important one. The second one is supposed to be extremely stringent. And if Congress intended for there to be a lesser standard for capital versus non-capital cases, they certainly could have included that. But under AEDPA, what we are doing in this procedure is seeing if we're going to give him more than the one shot he's entitled to. And every intrusion into the state court system is something, as the Supreme Court recently counseled, against. And that's exactly what this would be. It is an extraordinary intrusion to permit, especially where here the state courts have addressed some of the components of these claims, to permit these kinds of things. I don't think the fact that it's a death penalty case changes that calculus. And to Your Honor's point about if there are questions on diligence, there's still a second prong here. And he must show that he can meet both. And turning to that second prong, the actual innocence prong, what he must show at this stage is that it is reasonably likely that not a single juror would have voted to convict him. And he simply can't. As an initial matter, Vasquez's actual innocence argument here isn't the usual kind. He's not arguing that somebody else did it, like did the petitioners in House Ebell, Schlupf v. Dello, and In re Will. Counsel, did he testify at either the guilt stage or the penalty stage? He testified at guilt, Your Honor. Okay. And also with regard to there was a statement, Mr. Vasquez, March 6, 1998, voluntary statement, was the entirety of that introduced into evidence? It was, Your Honor. Okay. All right. I also wanted to ask you, since we're on who testified, the victim's mother also testified? Is that correct? Yes, Your Honor. She did. Okay. Okay. All right. And his innocence argument is also different in the sense that he's not challenging the special circumstance that distinguishes a capital murder from a murder in Texas, which is simply that she was under the age of six. Nor is he arguing that he's guilty of all homicide or all culpability. In trial, he admitted that he caused her death, and the jury was charged with murder and manslaughter. And on top of that, he essentially concedes that he might be guilty of murder or manslaughter. His argument here is instead a hyper-technical one about the degree of his culpability regarding her death, i.e. You say hyper-technical, but isn't that the whole point of the death penalty? I mean, it's a pretty hyper-technical area. What he's attacking is the mens rea that was required for a capital conviction. Correct, Your Honor. He is attacking the mens rea. Then he's innocent of capital murder, correct? The problem here, Your Honor, is that the mens rea is shared across different homicides. It is both the mens rea for murder as well as the mens rea for capital murder. The mens rea component is not the distinction between a capital and a non-capital murder. It is the special aggravating circumstance, which is enumerated in 19.03 in the Texas Penal Code. Here— Recklessness isn't enough for a capital murder. That's correct. It was intentional, knowing and intentional. Again, we had this discussion of I'm not in any way saying it's a good idea to go hit someone, but hitting someone doesn't necessarily mean you're intending to murder them, whereas giving them twice the cocaine that would kill an adult when they're 4 years old, hard to argue anything else, right? So there is some stuff here that, you know, so he's kind of fighting with the daughter of his girlfriend and she ends up dying is not the same thing as capital murder necessarily, as your opponent pointed out all kinds of—and this is all sad and I'm not in any way justifying it, but, you know, a kid drowns in the pool and maybe the parents are charged with something, but they're usually not charged with capital murder on that even if the kid is 4 years old, right? Yes, Your Honor, and admittedly a mens rea argument even at trial is difficult to prove because it is necessarily a subjective inquiry. And this jury asked about the cocaine so they obviously thought it mattered or they wouldn't have asked a question about it. I was a state district judge on civil cases, so not criminal, and jurors didn't ask a whole lot of questions, but when they did, it was something that obviously mattered to them. Well, Your Honor, in response to that, I would note that the standard is not this jury. It is a reasonable, not an idiosyncratic jury. No, I understand that, but it does suggest that, I mean, you obviously can pick all kinds of different juries, but it suggests that it mattered to a jury. Why isn't that relevant to us? The only questions that the jury answered or asked was about the timing of the cocaine, just where in relation, and the question was just a dispute about what the testimony was. I think it is difficult to discern much from just that question about how important this evidence was, and in particular, I would disagree with my co-counsel's assertion that this was the most important evidence on mens rea at all. The state's mens rea case was multifaceted, as it tends to be in these types of cases, and here it fell into four general areas, as actually both this court and the district court have previously recognized in prior proceedings. Those four areas. The first area was simply the force involved in the brutal beating of Miranda. He was indicted on causing her death with strikes by his hand. He admitted to hitting her with his hand. Then you've got the problem of the crash science, the 65-mile-per-hour impact and those kinds of things. I mean, I guess the question there is was there a consensus in 06 when he filed his original federal petition so that that should have been raised? You might want to talk about that because you just said that's one of the key things about mens rea. I'm happy to talk about that, Your Honor, and yes, there was a consensus, and again, assuming this is a proper constitutional claim within 2244B at all, it is clear he could have raised it either prior to or during the initial federal habeas proceedings. In proposed findings of fact and conclusions of law drafted by the same attorney currently representing Mr. Vasquez, nearly half of the 50 studies he cited therein were published in or before 2006 when he filed his federal petition, and even more of them were published before 2008 when the district court ultimately denied relief. Notably here, he conceded in those findings that the science for head injury thresholds in infants changed, in his words, dramatically in 2002 and that it's remained consistent ever since. And also importantly, the same counsel who argued in the state habeas evidentiary hearing that had a case that was, quote, on all fours with Mr. Vasquez's case, that case was decided a full eight months before the district court ever denied relief here. If Mr. Henderson and ex parte Henderson successfully obtained a remand on virtually identical claims to Mr. Vasquez's in 2007, then Mr. Vasquez absolutely could have, too. And under this Court's feasibility analysis, he certainly could have moved to amend the petition to include these claims, and he could have sought a stay to exhaust them. Those facts alone show that he could have raised this in his prior petition or at the very latest during, and as such, he cannot meet the diligence prong on the junk science claim in Claim 7. Okay, so back to your other grounds from Israel. Sorry. Yes. And turning... Thank you for that, though. Of course. Of course. Turning back to that, and Your Honor's right to talk about that testimony. However, the cause of death determination, i.e., that it was blunt force trauma to her brain and her head, was made by the medical examiner before that testimony was ever proffered. And what's actually clear is that the impact equivalency testimony pales in comparison to the fact that the blows to her head were strong enough to cause her to be brain dead by the time that she arrived at the hospital, only a short few hours later. It bears keeping in mind here that Miranda Lopez was a 4-year-old child, barely 4 feet and 40 pounds. It is difficult to conceive in that circumstance that an adult male repeatedly inflicting blows to her head didn't at least know, which is also one of the mens rea requirements in capital murder, that he could kill her. That's especially true given that no expert he proffers now says the blows to the head wouldn't be enough to kill her. And in fact, they say it's possible. And they also say that it's clear that all of her injuries could have been intentional and that there is no way to distinguish intentional and accidental forces. And that can be found in Mr. Vasquez's appendix at A1360. In light of that, I think that highlights again the director's earlier point about the difficulty of this kind of hyper-technical mens rea argument being one that can be sustained as an actual innocence argument. But even setting that aside, if that evidence was presented to the jury, as the court must consider, it seems inconceivable that that would meet the clear and convincing evidence standard that he must prove under 2244B2B2. And that's not to mention on top of the other pillar here, which was the sexual assault evidence that the state relied on. That evidence was compelling, and it's not contested in this current proceeding by the claims before the court. It was one of the worst cases that the state's expert had ever seen. She had a one-inch long and deep tear in her perineum area that could only have been caused by great force. And that alone provides a strong motive for why a man might want to silence a child. Then the third area of the state's case was essentially that there was no viable alternative explanation for her death. Mr. Vasquez now proffers the idea that a shortfall could have caused it. But the simple fact is that the jury never believed that a shortfall occurred. He lied repeatedly about how it happened. He said she fell forwards at trial. He previously said she fell backwards. He said that she was brushing her teeth, and no EMT found toothpaste when they were intubating her on the scene. He said that she fell off a stool, and no first responder saw the stool in the vicinity he suggested it was. In light of his entire lack of credibility, no additional expert testimony about a shortfall would cause any effect on the jury's determination. And that's all even without taking the cocaine evidence into account. There's also, though, more. The neighbor heard him threaten her. He admitted he didn't care about her and that he was mad at her that day. He lied to first responders about her injuries. And he lied so much that the state used it as affirmative evidence of consciousness of guilt. In light of all that, it cannot be said that any reasonable juror would have had a question about his guilt. And that is basis alone to deny authorization. I'm out of time, Your Honors. So for all the foregoing reasons, the director respectfully asks that the court deny authorization. Thank you, Your Honor. I want to address Dr. Bakker's testimony at trial. Counsel indicated that he said in his testimony and made clear that the drug abuse screen did test for cocaine. I would point the court's attention to page 5 of his testimony. I believe it's volume 34 at lines 22 and 23. He testified that the drugs of abuse screen tested for the most common prescription drugs that would be available. That doesn't sound like cocaine. That doesn't sound like cocaine. We asked you to provide a basic appendix, and you just gave us everything out there. This was the kind of thing we were looking for is what are the basic, what are the things you really want us to focus on, not 25 notebooks. I apologize, Your Honor. We thought that the request was to provide tab notebooks of all of the exhibits. We wanted to get to the bottom line. What are you focusing on and not trying to read thousands of pages, and you didn't do that. This strikes me as the kind of thing you're wanting us to look at. Absolutely, Your Honor. And I apologize if I misunderstood the court's instruction. But the fact is that Dr. Bacter's testimony is at best confusing. And now with hindsight, now that we know this dichotomy between the two results, it almost appears to be intentionally so. And you've got to factor in also that part of the Brady claim we have is not only the notes, but there's an indication in the State's files that they initially intended to offer the toxicology report as a stand-alone exhibit, and they did not do so. Counsel says it's just me saying that they didn't show the report to Dr. Bacter. The testimony is clear. You can read his entire testimony, and he has not shown the report. The report did come into evidence buried as an attachment in the Driscoll medical records, but it was never by anybody separately discussed as the toxicology report. Dr. Bacter was testifying simply as to the results of it. But, I mean, it was in the record and counsel opposite – I mean defense counsel would have had it. No, I don't dispute they had it. And on the issue of is it just unreliable or was Dr. Bacter's testimony false, he testified unequivocally that to a reasonable degree of scientific certainty there was cocaine in this girl's system. That is false testimony when he later tells us and when we all now know that the report is not reliable. Wait a minute. It doesn't mean the testimony is false. In other words, the amount of the drug found in her system that was reported on that report could have been accurate. It just means there's an inconsistency on the face of the report. Respectfully, I would say that his testimony that there was cocaine in her system, which he could attest to to a degree of scientific certainty, is false because it cannot be scientifically certain if the face of the report are inconsistent. Well, it can be if what counsel opposite said, as I apprehended anyway, was accurate in that he had the data underlying the toxicology report that he was using at trial to testify. Did he? There is no suggestion at all in the record that he had anything in front of him, data or otherwise. He simply testified that we did some tests and there was .18 milligrams, et cetera, and that to a reasonable degree of scientific certainty that means she had cocaine in her system. That's what he testified to. Now, what's your response to your opponent's argument that even if we were to consider the district attorney's concessions, it was not conceding to anything constitutional and not to actual innocence or anything like that? What's your response to that? My response is, and this is Exhibit E to our proposed subsequent petition, those are the findings of fact that we submitted to the trial court in 2019, and the record is 100 percent clear that he told the state trial court at that point, I agree to these findings, and there's 300 some odd of them, many of which go to this cocaine issue and specifically to the falsity and unreliability of the cocaine evidence. He agreed to the findings that the evidence was false, that there was an inherent conflict in the report, and that it was material. Those are fact findings to which he agreed, and I would submit that this is not an extraordinary intrusion, what I'm asking the court to do, into the state court process in that context where the person charged by the Texas Constitution with making these kinds of decisions agrees with me. In our adversarial system, it has to mean something where the adversary, who looked at all the evidence, agrees with the opponent. Okay, unless my colleagues have any more questions, your time is up. We appreciate you serving as a pro bono attorney. We appreciate both sides' arguments. This was very helpful, and we have now concluded this sitting. Thank you very much. Thank you, Your Honor.